

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE May 17, 2018
Fairhurst, CJ.
CHIEF JUSTICE

This opinion was filed for record
at 8:00am on May 17, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| KITTITAS COUNTY, a municipal corporation and political subdivision of the State of Washington, | No. 93562-9 |
| Respondent, | En Banc |
| v. | Filed ___MAY 1 7 2018___. |
| SKY ALLPHIN, ABC HOLDINGS, INC., CHEM-SAFE ENVIRONMENTAL, INC., | |
| Petitioners, | |
| WASHINGTON STATE DEPARTMENT OF ECOLOGY, | |
| Defendant. | |

WIGGINS, J.—We decide here two important aspects of the work product doctrine. First, were the e-mails exchanged between the Kittitas County and the Department of Ecology work product? Second, if the e-mails are work product, are they discoverable under the Public Records Act (PRA), chapter 42.56 RCW? We hold that the e-mails are work product because they were prepared by or for Kittitas County in anticipation of litigation. Second, we hold that Kittitas County did not waive its work product protection because disclosure of the e-mails to Ecology never created a significant likelihood that an adversary would also obtain the information. As a result, we affirm the Court of Appeals.

FACTS AND PROCEDURAL HISTORY[1]

I.   Enforcement Action

Chem-Safe Environmental is a hazardous waste facility located in Kittitas County. Clerk's Papers (CP) at 2002. While inspecting a neighboring facility, James Rivard, the Kittitas County environmental supervisor, and Gary Bleeker, an Ecology employee, saw drums labeled as hazardous waste on property belonging to Chem-Safe and ABC Holdings. *Id.* 2000, 2002. Upon investigation, Rivard learned that Chem-Safe did not hold a permit to handle or store moderate risk waste. *Id.* at 2002.

Throughout the next two years, both Kittitas County and Ecology employees visited the Chem-Safe facility together, e-mailed one another about the matter, and met to discuss the progress in bringing Chem-Safe into compliance with state and local regulations. *Id.* at 2002-08. Chem-Safe never satisfied Kittitas County's or Ecology's requirements regarding operation of its facility. *Id.* at 2008.

Eventually, Kittitas County issued a "Notice of Violation and Abatement" (NOVA) requiring Chem-Safe to halt operations until it obtained the necessary permits and equipment and conducted contamination testing. *Id.* at 2009, 1265-68. The NOVA cover letter discussed the work of both Kittitas County and Ecology on the case and listed both as resources from which Chem-Safe could receive technical assistance to meet the NOVA's requirements. *Id.* at 1265.

---

[1] Since this case is a review of a grant of summary judgment, "we consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party," here, Chem-Safe. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014).

Chem-Safe appealed the NOVA, which was affirmed by a hearing officer. *Id.* at 1273-79. Chem-Safe then appealed the hearing officer's ruling, which was subsequently affirmed by the superior court and the Court of Appeals. *Id.* at 1281-88; *ABC Holdings, Inc. v. Kittitas County*, 187 Wn. App. 275, 348 P.3d 1222 (2015). We denied review of the appellate court decision. *ABC Holdings, Inc. v. Kittitas County*, 184 Wn.2d 1014, 360 P.3d 817 (2015).

During the course of the litigation, Kittitas County deputy prosecutors sent several e-mails back and forth to Ecology employees. In one of those e-mails, an Ecology employee e-mailed a county deputy prosecutor, asking, "Should these emails be considered *attorney-client privileged*?" CP at 1501 (emphasis added). The Kittitas County deputy prosecutor responded, "[Ecology] is not my client (Kittitas County is), therefore, these e-mails are not *attorney-client privileged*." *Id.* at 1500 (emphasis added). The Kittitas County deputy prosecutor copied her response to an assistant attorney general. *Id.* The assistant attorney general also responded, stating that the e-mails were not attorney-client privileged without a joint-prosecution agreement. *Id.* at 1499. The assistant attorney general also stated that there might be other privileges that applied to the e-mails but that she lacked enough information to know the specific options for keeping the e-mails privileged. *Id.* at 775. Thus, the record reflects only the parties' understanding of whether Kittitas County and Ecology's communications with one another were attorney-client privileged.[2]

---

[2] Unlike the dissent, we do not believe this exchange leads to a conclusion that Ecology and Kittitas County made no "further efforts to determine . . . [or] protect confidentiality in this

II.  Public Records Action

Against this backdrop, and while the Court of Appeals reviewed the NOVA, Sky Allphin, president of Chem-Safe, filed a PRA request with Kittitas County. *Id.* at 2001, 70. Allphin requested all records from January 1, 2010, forward relating to the inspection of Chem-Safe's facility and specifically requested correspondence from Kittitas County, Ecology, and other agencies. *Id.* at 70. Ultimately, Kittitas County produced more than 20,000 pages of records in monthly increments. *Id.* at 1108-14.

Allphin also filed a similar PRA request with Ecology. *Id.* at 71. Five days later, in response to a request from Kittitas County, Ecology "promised to withhold the records" while Kittitas County sought an injunction.[3] *Id.* at 2695-96, 2718 ("The Ecology public records officer promised that such records would not be released until [Kittitas] County had an opportunity to seek court protection as allowed by RCW 42.56.540 and 42.56.550."). Kittitas County sought, and the superior court granted, a temporary restraining order to prevent the release of several e-mails that Kittitas County claimed to be exempt from production as work product under the PRA. CP at 92-96, 661-67. Allphin disputed whether these e-mails were work product and, if so,

---

specific case." Dissent at 11. If the work product and attorney-client privilege are to remain distinct, we cannot rely on the parties' conclusions about the latter to infer their conclusions about the former. There was a reasonable expectation of confidentiality between the two agencies because of their common interest. *See infra* pp. 19-20. The only instance in which Ecology disclosed any work product was inadvertent. CP at 2695, 2719. As a result, we believe that there is sufficient evidence in the record to show that the parties did indeed protect confidentiality in this case.

[3] The single instance in which Ecology released a protected record was inadvertent. CP at 2695, 2719.

whether Kittitas County had waived any accompanying privilege. As a result, Allphin filed this PRA lawsuit against Kittitas County. Eventually, the parties narrowed down the list of disputed records to 32 e-mail chains. *Id.* at 781, 2722-24.

The superior court held an in camera review of the e-mail chains claimed exempt by Kittitas County. *Id.* at 781. After its review, the court determined the e-mails were exempt from production under the PRA as work product, enjoined Ecology from releasing the e-mails, and sealed them. *Id.* at 789. The court then granted summary judgment in favor of Kittitas County, holding that Kittitas County did not violate the PRA. *Id.* at 2978-83.

Allphin, Chem-Safe, and ABC Holdings (collectively Chem-Safe) appealed the superior court's grant of summary judgment and sealing of the e-mails. The Court of Appeals affirmed the superior court in a partially published opinion. *See Kittitas County v. Allphin*, 195 Wn. App. 355, 381 P.3d 1202 (2016).

The Court of Appeals concluded that the e-mails exchanged between Kittitas County and Ecology were work product because they "contain statements of fact and legal strategies prepared by and for the various employees of [Kittitas] County and Ecology in response to the Chem-Safe litigation." *Id.* at 366-67. It further concluded that "the two agencies agreed to undertake a joint/common cause in the regulatory enforcement litigation against Chem-Safe" and, thus, the work product protection in the e-mails was not waived by disclosure to Ecology because of the common interest doctrine. *Id.* at 369-70.

Chem-Safe filed a petition for review of the Court of Appeals decision with this court. We partially granted the petition on the issue of whether the common interest doctrine applied to the e-mails exchanged between Kittitas County and Ecology, exempting the documents from production under the PRA as work product.

## STANDARD OF REVIEW

We review challenges under the PRA de novo. RCW 42.56.550(3). Our review of summary judgment motions is also de novo. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *see also* CR 56(c).

## ANALYSIS

We first conclude that the e-mails exchanged between Kittitas County and Ecology are work product. Next, we adopt the rule, used by both federal and state courts, that a party waives its work product protection when it discloses work product documents to a third party in a manner creating a significant likelihood that an adversary will obtain the information. *See* 8 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2024 (3d ed. 2010). Using this rule, we conclude that Kittitas County did not waive its work product protection by exchanging e-mails with Ecology employees. As a result, the e-mails are not subject to disclosure under the PRA.[4]

---

[4] We decline to adopt a new, bright-line rule for the waiver of work product protection in the PRA context. We know of no state that has adopted the dissent's bright-line rule. Nor is the dissent's rule supported by the actual language of the PRA.

I.  The E-mails Are Work Product

We hold that the e-mails exchanged between Kittitas County and Ecology constitute work product. The e-mails were prepared by or for Kittitas County in anticipation of litigation over the NOVA. As a result, they qualify as work product under Civil Rule (CR) 26(b)(4).

### A. The PRA and the Controversy Exception

"The primary purpose of the PRA is to provide broad access to public records to ensure government accountability." *City of Lakewood v. Koenig*, 182 Wn.2d 87, 93, 343 P.3d 335 (2014). An agency must disclose responsive public records "unless the record falls within the specific exemptions of [the PRA] . . . or other statute." RCW 42.56.070(1). "Consistent with its purpose of disclosure, the PRA directs that its exemptions must be narrowly construed." *Koenig*, 182 Wn.2d at 94; *see also* RCW 42.56.030.

Here, Kittitas County claimed an exception from PRA disclosure under RCW 42.56.290, commonly referred to as the "controversy exception." *See Soter v. Cowles Publ'g Co.*, 162 Wn.2d 716, 732, 174 P.3d 60 (2007) (plurality opinion). That exception states,

> Records that are relevant to a controversy to which an agency is a party but which records would not be available to another party under the rules of pretrial discovery for causes pending in the superior courts are exempt from disclosure under [the PRA].

RCW 42.56.290. The standard for determining whether records would be discoverable in superior court is CR 26. *Limstrom v. Ladenburg*, 136 Wn.2d 595, 600-01, 963 P.2d 869 (1998) (holding that "a citizen has the right to inspect documents . . . unless the

7

documents requested would not be available to a party under the discovery rules set forth in the civil rules for superior court"). Here, Kittitas County claims that under CR 26(b)(4), the e-mails qualify as work product and thus are exempt from disclosure under the controversy exception.[5]

### B. Work Product

The work product doctrine originates from the United States Supreme Court case *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947). In *Hickman*, most of the crew of a tugboat died when it sank. *Id.* at 498. The representative of one of the deceased sued the owners of the tugboat. *Id.* Prior to the lawsuit, the owners' attorney made notes of interviews with the surviving crew and others with relevant knowledge about the accident. *Id.* During discovery, the plaintiff sent the defendants interrogatories asking them to produce all the statements that they had taken about the event. *Id.* at 498-99. The defendants refused to produce the notes and interviews taken by their attorney and were held in contempt. *Id.* at 499-500. They appealed, and the Court of Appeals reversed. *Id.* at 500. The Supreme Court granted certiorari and affirmed the Court of Appeals, holding that the work product of attorneys was protected from discovery by an adversary. *Id.* at 509-10.

First, the Supreme Court distinguished between attorney work product and materials that are privileged under the attorney-client privilege. *Id.* at 508. It noted that the scope of the attorney-client privilege did not protect information collected from a

---

[5] As we have noted, "The work product exemption was part of the original enactment of the public disclosure law in 1973. LAWS OF 1973, ch. 1 (Initiative 276), § 31(1)(j)." *Limstrom*, 136 Wn.2d at 608.

witness by an attorney acting on behalf of his or her client. *Id.* The Court also stated

that the attorney-client privilege did not extend to materials prepared by an attorney

for his or her use in prosecuting a case or to materials that "reflect[ed] an attorney's

mental impressions, conclusions, opinions or legal theories." *Id.*

After drawing this distinction, the Supreme Court went on to establish the

importance of protecting an attorney's files and mental impressions. *Id.* at 510. The

Court reasoned that more harm than good would result from allowing such discovery:

> Were such materials open to opposing counsel on mere demand, much
> of what is now put down in writing would remain unwritten. . . .
> Inefficiency, unfairness and sharp practices would inevitably develop in
> the giving of legal advice and in the preparation of cases for trial. The
> effect on the legal profession would be demoralizing. And the interests
> of the clients and the cause of justice would be poorly served.

*Id.* at 511.

The protection of an attorney's work product is not without limitation. The

Supreme Court noted that attorney documents containing relevant, nonprivileged

facts were discoverable under certain circumstances, such as when witnesses are no

longer available. *Id.* The Court was careful to note that even in these circumstances,

the burden rests on the party seeking production to "establish adequate reasons to

justify production through a subpoena or court order." *Id.* at 512.

Washington has a similar work product protection rule, which is codified in CR

26(b)(4):

> [A] party may obtain discovery of documents and tangible things . . .
> prepared in anticipation of litigation . . . only upon a showing that the
> party seeking discovery has substantial need of the materials in the
> preparation of such party's case and that party is unable without undue
> hardship to obtain the substantial equivalent of the materials by other

9

means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*See also Heidebrink v. Moriwaki*, 104 Wn.2d 392, 396, 706 P.2d 212 (1985). As a result, "[t]he work product doctrine does not shield records created during the ordinary course of business," but applies only to those materials prepared in "anticipation of litigation." *Morgan v. City of Federal Way*, 166 Wn.2d 747, 754, 213 P.3d 596 (2009). The "determination of whether material was prepared in the anticipation of litigation in a particular case, and thus qualifies as work product, requires examination of the specific parties and their expectations." *Harris v. Drake*, 152 Wn.2d 480, 487, 99 P.3d 872 (2004). The litigation may be "'completed, existing, or reasonably anticipated.'" *Soter*, 162 Wn.2d at 732 (quoting *Dawson v. Daly*, 120 Wn.2d 782, 791, 845 P.2d 995 (1993), *overruled on other grounds by Soter*, 162 Wn.2d at 755). When creating work product in anticipation of litigation, "there is no distinction between attorney and nonattorney work product." *Heidebrink*, 104 Wn.2d at 396.

Pursuant to this rule, we have established some specific guidelines regarding when an attorney's work product is discoverable:

> (1) The mental impressions of the attorney and other representatives of a party are absolutely protected, unless their mental impressions are directly at issue. *Pappas v. Holloway*, 114 Wn.2d 198, 212, 787 P.2d 30 (1990).

> (2) The notes or memoranda prepared by the attorney from oral communications should be absolutely protected, unless the attorney's mental impressions are directly at issue. *See Pappas*, 114 Wn.2d at 212; *Dever v. Fowler*, 63 Wn. App. 35, 48, 816 P.2d 1237 (1991).

> (3) The factual written statements and other tangible items gathered by the attorney and other representatives of a party are subject to disclosure only upon a showing that the party seeking disclosure of the documents actually has substantial need of the materials and that the party is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means, Mental impressions of the attorney and other representatives embedded in factual statements should be redacted. *Heidebrink*, 104 Wn.2d 392.

*Limstrom*, 136 Wn.2d at 611-12; *see also* Lewis H. Orland, *Observations on the Work Product Rule*, 29 GONZ. L. REV. 281 (1994). We have further described the scope of work product as follows:

> The civil work product protection applies to documents and other tangible things that (1) show legal research and opinions, mental impressions, theories, or conclusions of the attorney or of other representatives of a party; (2) are an attorney's written notes or memoranda of factual statements or investigation; and (3) are formal or written statements of fact, or other tangible facts, gathered by an attorney in preparation for or in anticipation of litigation.

*Limstrom*, 136 Wn.2d at 611.

For example, in *Soter*, we held that the notes of a school district's attorney and the notes of an investigator hired by that attorney were work product. 162 Wn.2d at 744. The attorney and investigator took the notes as part of the school district's investigation into the death of a child on a field trip. *Id.* at 722. The parents of the child sued the school district, and a newspaper filed a public records request with the school district, asking for the notes taken during the investigation. *Id.* at 723. The school district resisted production, asserting that the notes were work product and exempt from disclosure under the PRA controversy exception. *Id.* When deciding whether the notes were work product, we looked to the nature of the documents, whether those documents were prepared in anticipation of litigation, and whether the documents

revealed "the attorneys' and investigator's thoughts regarding client and witness interviews." *Id.* at 743. We concluded that the notes were created in anticipation of litigation over the child's death and they reflected the attorneys' and investigator's thoughts about the litigation. *Id.* at 743, 744 n.13. Consequently, we held that the notes were work product.

Here, Chem-Safe argues that *Soter* relied on the fact that the school district hired the investigator, while here, Kittitas County did not hire Ecology. As a result, Chem-Safe asserts that the e-mails written by Ecology employees cannot be work product. However, Chem-Safe's characterization of *Soter* is incorrect. In *Soter*, we did not conclude that the investigator's notes were work product *because* the investigator had been hired by the school district. Instead, we focused on whether the notes "reveal[ed] what information the attorney deemed particularly important and, conversely, what the attorney did not find important enough to record." *Id.* at 743-44. As a result, because the "notes reflect[ed] the attorneys' and investigator's thoughts regarding client and witness interviews," we concluded that they were work product. *Id.* at 743.

Here, as in *Soter*, all the e-mails were created in anticipation of litigation and reflect attorney opinions, thoughts, and conclusions about the litigation. Thus, the e-mails are work product. The e-mail chains all include one or more of the following

elements: (1) discussion of litigation-related technical, factual, and regulatory issues;[6] (2) draft declarations with edits and notes;[7] and/or (3) analysis of the risks of different litigation positions in the Chem-Safe lawsuit.[8] All of these e-mails were created for investigative purposes or in pursuit of Kittitas County's litigation strategy surrounding the NOVA. Consequently, the e-mails contain "legal research and opinions, mental impressions, theories, or conclusions," as well as "written notes or memoranda of factual statements or investigation" regarding the NOVA litigation. *Limstrom*, 136 Wn.2d at 611. The e-mails were prepared directly by Kittitas County's deputy prosecutors or included material prepared by Ecology representatives at the request of, and in support of, the deputy prosecutors. *See Heidebrink*, 104 Wn.2d at 396 (concluding "there is no distinction between attorney and nonattorney work product").[9] Thus, the e-mails were created "by or for" Kittitas County to use in the Chem-Safe litigation. *See* CR 26(b)(4). As a result, they constitute work product under CR 26(b)(4)

---

[6] *See, e.g.*, e-mail exchanges over Chem-Safe's status as a "UST contractor," CP at 3146, 3239 (sealed record), and over soil contamination. *Id.* at 3266-67.

[7] *See, e.g., id.* at 3289-3305 (e-mail chain with red-line edits and notes on draft declaration from Ecology employees).

[8] *See, e.g., id.* at 3064 (discussion of the fraud/forgery doctrine), 3144 (discussion of litigation strategy).

[9] *See also Soter*, 162 Wn.2d at 739 n.9 ("The United States Supreme Court has acknowledged that under the nearly identical federal rule, the work product doctrine protects 'material[s] prepared by agents for the attorney as well as those prepared by the attorney himself.' Therefore, we conclude that [the investigator's] handwritten notes should be treated no differently from the attorneys'." (first alteration in original) (citation omitted) (quoting *United States v. Nobles*, 422 U.S. 225, 238-39, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975))).

and are not discoverable unless the work product protection has been waived by Kittitas County.[10]

## II. Waiver of Work Product Protection

Having concluded that the e-mails are work product, we must now decide whether Kittitas County waived its work product protection. Washington has yet to define a clear rule governing waiver of work product protection. *See Limstrom v. Ladenburg*, 110 Wn. App. 133, 144, 39 P.3d 351 (2002) ("Absent Washington case law on waiver of work product immunity, we look to other jurisdictions."). We now

---

[10] Chem-Safe also makes two related arguments for the first time in its answer to the State's amicus brief. Generally, the court will not consider arguments raised for the first time in a reply brief. *See Cowiche Canyon Conservancy v. Bosley,* 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (stating that an issue raised and argued for the first time in a reply brief is too late to warrant consideration). However, we choose to address the arguments, and reject them.

First, Chem-Safe argues that an administrative appeal over a NOVA is not a "controversy" for purposes of RCW 42.56.290. Pet'r's Answer to Wash. Amicus Br. at 3-6. As a result, it contends that the e-mails cannot be considered exempt from disclosure under the PRA's controversy exception.

A controversy is "'completed, existing, or reasonably anticipated litigation.'" *Soter*, 162 Wn.2d at 732 (quoting *Dawson*, 120 Wn.2d at 791). Here, Chem-Safe appealed imposition of the NOVA to the Kittitas County hearing examiner. CP at 1273-79. After the adverse ruling from the hearing examiner, Chem-Safe then appealed to the superior court. *Id.* at 1281-88. After an adverse ruling from the superior court, Chem-Safe again appealed, this time to the Court of Appeals. *Id.* at 1291-92. Finally, Chem-Safe appealed the adverse Court of Appeals ruling to this court, which denied review. *ABC Holdings, Inc.*, 187 Wn. App. 292. This process certainly qualifies as "'completed, existing, or reasonably anticipated litigation.'" *Soter*, 162 Wn.2d at 732 (quoting *Dawson*, 120 Wn.2d at 791). It would be absurd to characterize it any other way.

Second, Chem-Safe argues that the correspondence between Kittitas County and Ecology related to the potential "[Model Toxics Control Act, chs. 70.105D and 82.21 RCW,] order," not to enforcement of the NOVA; therefore, the e-mails were not prepared in anticipation of litigation. Pet'r's Ans. to Wash. Amicus Br. at 6-7. This argument is without support in the record. The e-mails pertained to the appeals between Kittitas County and Chem-Safe over the NOVA. There is no evidence in the record that Kittitas County and Ecology discussed anything other than the NOVA litigation.

adopt the rule that a party waives its work product protection when it discloses work product documents to a third party in a manner creating a significant likelihood that an adversary will obtain the information. Using this rule, we hold that Kittitas County did not waive its work product protection.

### A. Waiver in the Work Product Protection Context

A party waives its work product protection when "the client, the client's lawyer, or another authorized agent of the client . . . discloses the material to third persons in circumstances in which there is a significant likelihood that an adversary or potential adversary in anticipated litigation will obtain it." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 91(4) (AM. LAW INST. 2000). This is the rule used by both federal and other state courts. *See, e.g., In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) ("[I]t is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product doctrine is waived."); *O'Boyle v. Borough of Longport*, 218 N.J. 168, 193, 94 A.3d 299 (2014) ("'[I]t is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product doctrine is waived.'" (quoting *In re Chevron Corp*, 633 F.3d at 165)); *Am. Zurich Ins. Co. v. Thirteenth Judicial Dist. Court*, 2012 MT 61, ¶ 26, 364 Mont. 299, 280 P.3d 240 ("Disclosure only waives work product protection if it is 'inconsistent with the maintenance of secrecy from the disclosing party's adversary.'" (quoting *United States v. Deloitte LLP*, 391 U.S. App. D.C. 318,

15

610 F.3d 129, 140 (2010))).[11] In clarifying a work product waiver rule, federal case law is persuasive since CR 26(b)(4) is nearly identical to Federal Rule of Civil Procedure 26(b)(3). *See Soter*, 162 Wn.2d at 739 ("Where a state rule is identical to its federal counterpart, analyses of the federal rule provide persuasive guidance as to the application of our comparable state rule.").

It is also illuminating to contrast the work product protection to the attorney-client privilege. The work product doctrine is designed to protect the efforts of an attorney and those who assist attorneys from disclosure to a litigation adversary. *United States v. Am. Tel. & Tel. Co.*, 206 U.S. App. D.C. 317, 642 F.2d 1285, 1299 (1980) ("[T]he work product privilege does not exist to protect a confidential relationship, but rather to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent. The purpose of the work product doctrine is to protect information against opposing parties, rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation." (emphasis and footnote omitted)). By contrast, the attorney-client privilege is designed to protect the confidentiality of

---

[11] *See also United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997) ("[O]nly disclosing material in a way inconsistent with keeping it from an adversary waives work product protection."); *United States v. Am. Tel. & Tel. Co.*, 206 U.S. App. D.C. 317, 642 F.2d 1285, 1299 (1980) ("A disclosure made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the [work product] privilege."); *Wynn Resorts, Ltd. v. Eighth Judicial Dist. Court*, ___ Nev. ___, 399 P.3d 334, 349 (2017) ("[S]elective disclosure of work product to some, but not to others, is permitted. Waiver of the protection is, however, usually found when the material is disclosed to an adversary." (citations omitted)); *Limstrom*, 110 Wn. App. at 145 ("If a party discloses documents to other persons with the intention that an adversary can see the documents, waiver generally results.").

communications between attorney and client. *Id.* ("The attorney-client privilege exists to protect confidential communications, to assure the client that any statements he makes in seeking legal advice will be kept strictly confidential between him and his attorney; in effect, to protect the attorney-client relationship." (emphasis omitted)).

Since the purposes of the work product doctrine and the attorney-client privilege are different, it should come as no surprise that standards for waiving attorney-client privilege and work product protection are also different. The work product protection permits disclosure to some, but not all, third parties:[12]

> Effective trial preparation often entails disclosing work product to coparties and nonparties. Work product, including opinion work product, may generally be disclosed to the client, the client's business advisers or agents, the client's lawyer or other representative, associated lawyers and other professionals working for the client, or persons similarly aligned on a matter of common interest.

RESTATEMENT § 91 cmt. b. As a result, "while the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege." *Am. Tel. & Tel. Co.*, 642 F.2d at 1299 (emphasis omitted).

In contrast, for the attorney-client privilege, "[t]he presence of a third person during the communication waives the privilege." *Morgan*, 166 Wn.2d at 757; *see also In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012) (noting "that voluntarily disclosing privileged documents to third parties will generally destroy the

---

[12] *See also O'Boyle*, 218 N.J. at 198 ("We acknowledge, however, that how far beyond 'the magic circle' privileged material may be shared depends on whether the disclosed material is protected by the attorney-client privilege or the work-product doctrine.").

[attorney-client] privilege"); RESTATEMENT § 79 ("The attorney-client privilege is waived

if the client, the client's lawyer, or another authorized agent of the client voluntarily

discloses the communication in a nonprivileged communication.").

The different standards of waiver for the attorney-client privilege and work

product protection result from the differing purposes behind the doctrines:

> The [attorney-client] privilege, it is said, is designed to protect
> confidentiality, so that any disclosure outside the magic circle is
> inconsistent with the privilege; by contrast, work product protection is
> provided against "adversaries," so only disclosing material in a way
> inconsistent with keeping it from an adversary waives work product
> protection.

*United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997). *Compare*

*Pac. Pictures*, 679 F.3d at 1127 ("The reason behind [the attorney-client privilege

waiver] rule is that, '[i]f clients themselves divulge such information to third parties,

chances are that they would also have divulged it to their attorneys, even without the

protection of the privilege.'" (internal quotation marks omitted) (second alteration in

original) (quoting Comments, *Stuffing the Rabbit Back into the Hat: Limited Waiver of*

*the Attorney-Client Privilege in an Administrative Agency Investigation*, 130 U. PA. L.

REV. 1198, 1207 (1982))), *with Chevron Corp.*, 633 F.3d at 164-65 ("[T]he work-

product doctrine protects an attorney's work from falling into the hands of an

adversary, and so 'disclosure to a third party does not necessarily waive the protection

of the work-product doctrine.' Rather, the purpose behind the work-product doctrine

'requires [a court] to distinguish between disclosures to adversaries and disclosures

to non-adversaries[,]' and it is only in cases in which the material is disclosed in a

manner inconsistent with keeping it from an adversary that the work-product doctrine

is waived." (citations omitted) (alterations in original) (quoting *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991)). [13]

For the foregoing reasons, we are persuaded that the rule adopted by both federal and state courts regarding the waiver of work product protection is sound and thus adopt it as the rule in Washington State.

### B. Kittitas County Did Not Waive Its Work Product Protection

We turn now to whether Kittitas County created "a significant likelihood that an adversary or potential adversary in anticipated litigation" would obtain its work product when it exchanged e-mails containing work product with Ecology. RESTATEMENT § 91(4). We hold that that Kittitas County did not waive its work product protection when the deputy prosecutors and Ecology employees exchanged e-mails about the NOVA litigation. The disclosures between Kittitas County and Ecology never created a circumstance in which it was significantly likely that Chem-Safe would be able to obtain the work product.

As discussed above, the work product doctrine permits parties to share work product in certain contexts without waiving the accompanying protections of the

---

[13] While it does not appear that any states or federal courts have officially adopted the same standard of waiver for both the attorney-client privilege and work product protection, the standards for waiver are sometimes conflated. *See* WRIGHT ET AL., *supra*, § 2024, at 530-32 ("There are some cases that suggest that any disclosure of a document to a third person waives the work-product immunity to which it would otherwise be entitled. Decisions to this effect confuse the work-product immunity with the attorney-client privilege. . . . Thus, the result should be that disclosure of a document to third persons does not waive the work product immunity unless it has substantially increased the opportunities for potential adversaries to obtain the information. Most cases have so held and have found no waiver from disclosure." (footnotes omitted)).

doctrine. *See* RESTATEMENT § 91 cmt. b. A party can share work product with coparties and others who are similarly aligned on a matter of common interests because such parties are unlikely to disclose work product to adversaries. *Am. Tel. & Tel. Co.*, 642 F.2d at 1299 (holding that "with common interests on a particular issue against a common adversary, the transferee is not at all likely to disclose the work product material to the adversary"). As a result, parties who share a common interest have a reasonable expectation of confidentiality. *In re Subpoenas Duces Tecum*, 238 U.S. App. D.C. 221, 738 F.2d 1367, 1372 (1984).

The parties do not need a written agreement to maintain confidentiality in order for the work product protection to apply. "While [a written] agreement can serve as evidence of the parties' reasonable intent that information exchanged between those with a shared interest remain confidential, it should not be a prerequisite to the application of the common interest doctrine." Katharine Traylor Schaffzin, *An Uncertain Privilege: Why the Common Interest Doctrine Does Not Work and How Uniformity Can Fix It*, 15 B.U. PUB. INT. L. J. 49, 82-83 (2005). Instead, a reasonable expectation of confidentiality may derive from common litigation interests between the disclosing party and the recipient. *Am. Tel. & Tel.*, 642 F.2d at 1299 ("with common interests on a particular issue against a common adversary, the transferee is not at all likely to disclose the work product material to the adversary"); *see also Subpoenas*, 738 F.2d at 1372.

Here, there are several factors demonstrating that Kittitas County and Ecology were "similarly aligned on a matter of common interest" and thus had a reasonable

expectation of confidentiality. RESTATEMENT § 91 cmt. b. First, RCW 70.105.005 obliges Kittitas County and Ecology to cooperate on hazardous waste regulation. *See* RCW 70.105.005(10) (stating that "local government is the appropriate level of government to plan for and carry out programs to manage moderate-risk waste, *with assistance and coordination provided by [Ecology]*" (emphasis added)). Pursuant to this statutory direction, Kittitas County and Ecology worked together throughout the investigation into Chem-Safe's facility and throughout the appeal. CP at 2002-08. Kittitas County shared litigation strategy with Ecology and asked for its technical assistance on matters relating to the litigation. This common interest between Kittitas County and Ecology was more than a general interest in environmental standards or a mere shared desire to see a similar outcome in a legal matter. Instead, Kittitas County and Ecology shared a common *legal* interest to ensure that Chem-Safe complied with both local and state regulations regarding its operation of a hazardous waste facility.

Second, Kittitas County and Ecology cooperated over a period of several years. From 2008 to 2010, Kittitas County employees and Ecology employees visited the Chem-Safe facility together, e-mailed one another about the matter, and met to discuss the progress of bringing Chem-Safe into compliance. *Id.* at 2002-08. After the NOVA was issued and throughout 2011 and 2012, Kittitas County deputy prosecutors e-mailed Ecology employees to discuss litigation strategy and to request technical support on relevant factual matters related to the NOVA litigation. *See id.* at 781, 2724.

The fact that Kittitas County and Ecology cooperated on the NOVA over a period of several years weighs in favor of a finding that they shared a common interest.

Third, Kittitas County and Ecology engaged in considerable sharing of work product. Although Kittitas County and Ecology did not have a formal confidentiality agreement, no written agreement to maintain confidentiality is required. Kittitas County employees e-mailed Ecology employees several times to discuss litigation-related technical, factual, and regulatory issues and the risks of different litigation positions in the Chem-Safe lawsuit. They also drafted declarations for the litigation, exchanging edits and notes on different versions. Such significant sharing of work product affirms Kittitas County and Ecology's intent to develop a common strategy to defend the NOVA in the related litigation.

Beyond the sharing of work product, there is evidence of other significant cooperation between Kittitas County and Ecology. Kittitas County employees and Ecology employees visited the Chem-Safe facility together several times while working to bring Chem-Safe into compliance with local and state hazardous waste regulations. *Id.* at 2002-08. Kittitas County employees and Ecology employees e-mailed one another and met together to discuss the ongoing issues at Chem-Safe. *Id.* at 2002-08. The two also shared relevant information with one another regarding issues with Chem-Safe's compliance, such as a letter from the Idaho State Department of Environmental Quality about Chem-Safe. *Id.* at 2008. The NOVA cover letter referenced the participation of both Kittitas County and Ecology in investigating and working with Chem-Safe to resolve issues at its facility. *Id.* at 1265. This significant

level of cooperation between Kittitas County and Ecology further evinces their common interest in the NOVA litigation.

As parties "similarly aligned on a matter of common interest," Kittitas County and Ecology had a reasonable expectation of confidentiality and thus did not waive work product protection by sharing e-mails back and forth. RESTATEMENT § 91 cmt. b.

## C. Waiver of Work Product under the PRA

Despite the common interest between Kittitas County and Ecology, Chem-Safe argues that the PRA entitles it to obtain the e-mails from Ecology. We disagree.

As public agencies, both Ecology and Kittitas County are subject to required disclosures under the PRA. But, the PRA does not give an adversary the presumptive right to obtain work product. In fact, the opposite is true; the PRA specifically *exempts* work product from disclosure. RCW 42.56.290 ("Records that are relevant to a controversy to which an agency is a party but which records would not be available to another party under the rules of pretrial discovery for causes pending in the superior courts are *exempt from disclosure* under this chapter." (emphasis added)). Because they are work product, the disputed e-mails "would not be available to another party under the rules of pretrial discovery for causes pending in the superior courts." *Id*; *see* CR 26(b)(4) (exempting work product from pretrial discovery unless a party shows undue hardship). And the scope of the work product protection is no different in a PRA setting than it is in a general civil litigation setting. *Soter*, 162 Wn.2d at 743 ("Moreover it is important to consider that while this case happens to be a public records case, when evaluating the extent of the protection offered by CR 26(b)(4), we are

23

interpreting the civil discovery rule that applies to all civil cases. When we interpret the meaning of CR 26(b)(4)'s work product protection, we not only impact attorneys representing government agencies, but we will impact *all* attorneys engaging in civil practice."). It follows under RCW 42.56.290 that the e-mails are exempt from disclosure under the PRA.

"[A] litigant should not succeed in obtaining opinion work product that would be protected from discovery by [the civil rule] by seeking the opinion work product through a public records request." *DaRosa v. City of New Bedford*, 471 Mass. 446, 459, 30 N.E.3d 790 (2015). Under CR 26(b)(4), we allow the disclosure of work product only under narrow circumstances. For example, we permit disclosure when the mental impressions of the attorney are directly at issue or the party seeking disclosure has substantial need for factual information that he or she would be unable, without undue hardship, to obtain. *Limstrom*, 136 Wn.2d at 611-12. However, even under the latter situation, we still require that the mental impressions of the attorney be redacted. *Id.*

Here, Chem-Safe has not alleged that the mental impressions of the deputy prosecutors are at issue. Nor does Chem-Safe argue that it is entitled to the factual information contained in the e-mails based on undue hardship. As a result, Chem-Safe has not shown that it is entitled to disclosure of the e-mails under CR 26(b)(4), and the mere fact that it brings its request under the PRA does not entitle it to disclosure either.

In short, when Kittitas County sent the work product documents to Ecology, the documents did not lose their protection as work product; they remained exempt from

24

discovery and therefore exempt from production under the PRA. *See* RESTATEMENT § 87(3) ("Except for material which by applicable law is not so protected, work product is immune from discovery or other compelled disclosure.").

## CONCLUSION

We hold that the e-mails exchanged between Kittitas County and Ecology constitute work product. All the e-mails were created by or for Kittitas County in anticipation of the litigation between Kittitas County and Chem-Safe over the NOVA. We also adopt the rule used by both federal and state courts for work product protection waiver and hold that Kittitas County did not waive its work product protection when it exchanged the e-mails with Ecology because disclosure of the e-mails to Ecology did not make it substantially likely that Chem-Safe would obtain the information. As a result, we affirm the Court of Appeals.

WE CONCUR.

26

No. 93562-9

YU, J. (dissenting) — I agree with the majority on many points in this case.

The content of the disputed e-mails is clearly work product, so unless the

protections of the work product doctrine have been waived, the e-mails are exempt

from production in accordance with the Public Records Act (PRA), chapter 42.56

RCW. Majority at 12-13; RCW 42.56.290. And I agree with the implied waiver

doctrine as articulated by the majority in this case:

> A party waives its work product protection when "the client, the
> client's lawyer, or another authorized agent of the client . . . discloses
> the material to third persons in circumstances in which there is a
> significant likelihood that an adversary or potential adversary in
> anticipated litigation will obtain it."

Majority at 15 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS,

§ 91(4) (AM. LAW INST. 2000)). I further agree that Kittitas County (County) and

the Department of Ecology had a common legal interest in this litigation, and I

agree that, *ordinarily*, "[a] party can share work product with coparties and others

1

who are similarly aligned on a matter of common interests because such parties are unlikely to disclose work product to adversaries." *Id.* at 20.

However, the County and Ecology are not ordinary parties. They are independent public agencies with independent obligations to comply with the PRA. I would hold that the circumstances under which the County voluntarily disclosed the disputed e-mails to Ecology in this case *did* create a significant likelihood that an adversary would obtain them and, therefore, that the County presumptively waived the protections of the work product doctrine. And while the common interest doctrine can provide an exception to presumptive waiver by voluntary disclosure, I would hold that it does not apply here. I therefore respectfully dissent.

## ANALYSIS

For obvious reasons, as explained by the majority, an attorney is entitled to protect his or her thoughts, impressions, and litigation strategies. *Id.* at 8-10. However, an attorney who practices within a public agency that is subject to our public disclosure laws surely must appreciate the reality that all communications could be subject to production once shared with a third party. I would hold that attorneys who wish to benefit from the work product doctrine's protections must take reasonable steps to safeguard the confidentiality of their materials and that in this case, there is no evidence in the record that the County did so.

A.  Voluntary disclosure of work product to a third-party public agency
    presumptively waives work product protections

The County and Ecology are both subject to the PRA's "'strongly-worded

mandate for open government.'" *Fortgang v. Woodland Park Zoo*, 187 Wn.2d

509, 512, 387 P.3d 690 (2017) (quoting *Rental Hous. Ass'n of Puget Sound v. City

of Des Moines*, 165 Wn.2d 525, 527, 199 P.3d 393 (2009)). It is certainly true that

a public agency's work product enjoys the same *substantive* level of protection as

the work product of a private litigant in the civil discovery process. RCW

42.56.290; CR 26(b)(4); *Sanders v. State*, 169 Wn.2d 827, 854, 240 P.3d 120

(2010); *Soter v. Cowles Publ'g Co.*, 162 Wn.2d 716, 743, 174 P.3d 60 (2007)

(plurality opinion). However, we should account for the fact that the PRA creates

an entirely different *procedure* for the public to attempt to obtain any record,

including work product, that is "prepared, owned, used, or retained by any state or

local agency." RCW 42.56.010(3). This procedure, *by design*, substantially

increases the likelihood that anyone, including a litigation adversary, will obtain

the records. Therefore, I would hold that voluntary disclosure to a third-party

public agency presumptively waives the protections of the work product doctrine.

In accordance with the PRA, every public record of every public agency is

presumptively "available for public inspection and copying . . . unless the record

falls within the specific exemptions of [the PRA]." RCW 42.56.070(1). Everyone

in the world is entitled to request a public agency's records at any time and for

3

almost any reason. This is true even if the requester is an adversary to a public agency, and even if the requester is likely attempting to use the PRA in order to gain an advantage in civil litigation, because absent a specific statutory provision to the contrary, "agencies may not inquire into the identity of the requestor or the reason for the request." *Cornu-Labat v. Hosp. Dist. No. 2*, 177 Wn.2d 221, 240, 298 P.3d 741 (2013).

Unlike civil discovery disputes, PRA disputes can be resolved only in an independent cause of action, and the PRA places the burden on the party resisting production to prove there is an applicable exemption. *Soter*, 162 Wn.2d at 731. The PRA further provides that even if the party proves an applicable exemption, it cannot obtain an injunction to prevent public examination of the records unless it also proves that "such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions." RCW 42.56.540.

Disclosure to a public agency does not by any means make it certain that an adversary will be able to access the materials. It does, however, substantially increase the likelihood of that happening because once the PRA applies, adversaries have an entirely separate mechanism to obtain the materials outside of the ordinary civil discovery process. That is well illustrated by the facts of this case.

Ecology had no statutory obligation to inform the County of Sky Allphin's PRA request, but it chose to do so as a matter of discretion. *See id.* Upon learning of the request, the Kittitas County Prosecutor's Office "immediately contacted Ecology to ask that any records involving communications between the Kittitas County civil deputy prosecutor and Ecology professional and technical staff not be disclosed to Respondent Allphin until the County could seek court protection." Clerk's Papers (CP) at 105. Ecology's public records officer agreed to refrain from disclosing the disputed e-mails so that the County could seek a court order enjoining disclosure. However, from the time of the initial pleadings, Ecology has consistently stated that it did not intend to resist Allphin's request for the disputed e-mails and that it would have produced them if the County had not filed this declaratory judgment action.

The PRA provides actual or potential litigation adversaries with a procedure that substantially increases their likelihood of obtaining work product that is prepared, owned, used, or retained by a public agency. I would therefore adopt a bright-line rule that voluntary disclosure to a third-party public agency presumptively waives work product protection. RESTATEMENT § 91(4). This rule would appropriately reflect the PRA's broad mandate for public disclosure. *Fortgang*, 187 Wn.2d at 512. A bright-line rule would also give due regard for the importance of maintaining predictability because "[a]n uncertain privilege, or one

which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). And finally, it would reflect the fact that from the time of its inception, the work product doctrine has always been "an intensely practical one, grounded in the realities of litigation in our adversary system." *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975). Whenever a public agency is a party, the PRA is an unavoidable reality of litigation.

B.    While the common interest doctrine can provide an exception to presumptive waiver by voluntary disclosure, it does not apply in this case

This court recognizes an exception to implicit waiver by voluntary disclosure pursuant to the "'common interest' doctrine." *Sanders*, 169 Wn.2d at 853. And while I believe that the majority's multifactor test introduces unnecessary uncertainty in applying the common interest doctrine, I do agree that the County and Ecology had a common legal interest in the underlying litigation because they both "anticipate[d] litigation against a common adversary on the same issue or issues." *United States v. Am. Tel. & Tel. Co.*, 206 U.S. App. D.C. 317, 642 F.2d 1285, 1299 (1980); *see* majority at 20-22.

However, I would hold that the existence of a common legal interest does not automatically satisfy the common interest doctrine in all circumstances.[1] *Contra* majority at 22. Instead, I would hold that when at least one of the commonly interested parties is a public agency subject to the PRA, the parties must have some kind of mutual understanding that they will maintain confidentiality when they voluntarily share work product. *See* Br. of Amici Curiae Wash. Coal. for Open Gov't (WCOG), Am. Civil Liberties Union of Wash. (ACLU), & Spokesman-Review at 5-6. And the record in this case shows that Ecology and the County had no such mutual understanding at the time they shared their work product.

There is no doubt that public agencies often must collaborate and should not automatically lose the protections of the work product doctrine every time they do so in writing. As noted by the Court of Appeals in this case, the County's disclosures to Ecology were made for the purpose of "seeking assistance from Ecology's technical professionals in enforcing the state and county environmental laws." *Kittitas County v. Allphin*, 195 Wn. App. 355, 370, 381 P.3d 1202 (2016), *review granted*, 187 Wn.2d 1001 (2017). Without question, this is an entirely

---

[1] Likewise, the fact that a document is literally the product of one's work does not automatically mean it is protected by the work product doctrine. Majority at 9 ("'[t]he work product doctrine does not shield records created during the ordinary course of business,' but applies only to those materials 'prepared in anticipation in litigation'" (quoting *Morgan v. City of Federal Way*, 166 Wn.2d 747, 754, 213 P.3d 596 (2009))).

7

appropriate purpose for disclosing work product between government agencies,

and in many cases such collaboration is necessary for the agencies to perform their

duties. *E.g.*, RCW 70.105.005(10). The Court of Appeals was correct to note that

if such an interagency disclosure necessarily waives the work product doctrine,

public agencies may "forgo communicating with other law enforcement

professionals during litigation due to the fear that their opponents will obtain their

mental impressions and ideas." *Kittitas County*, 195 Wn. App. at 370.

However, this concern does not justify a rule that any time two or more

public agencies collaborate on a common legal interest, all interagency disclosures

necessarily retain the protections of the work product doctrine. Such an approach

would effectively treat all public agencies as a single public agency, or as members

of "the same 'legal team.'" Br. of Amici Curiae WCOG, ACLU, & Spokesman-

Review at 3. We should reject that approach as inconsistent with the PRA.[2] *Id.* at

4.

Instead, given the substantial increase in the likelihood that an adversary will

obtain work product if it is in the possession of a third-party public agency,

---

[2] Notably, the federal Freedom of Information Act *does* specifically exempt work product that is shared between different agencies. 5 U.S.C. § 552(b)(5). The PRA, however, does not, and Washington applies the common interest doctrine as an exception to waiver, not as an expansion of the work product doctrine or as an independent exemption. *Sanders*, 169 Wn.2d at 853-54.

discussed above, we should require that the parties have a mutual understanding

that each will take reasonable steps to maintain the confidentiality of work product

materials, including resisting production pursuant to the PRA.[3] While I agree with

the majority that no written agreement is required, the record here shows that the

County and Ecology did not have any mutual understanding at all. *See* majority at

20.

Critically, in July 2011, Norm Peck, an environmental specialist employed

by Ecology who had been working with the County, directly asked the County's

attorney, "Should these e[-]mails be considered attorney-client privileged?" CP at

777. The attorney for the County responded that Ecology "is not my client

(Kittitas County is), therefore, these e[-]mails are not attorney-client privileged."

*Id.* at 776. The County's attorney referred Peck to an assistant attorney general

(AAG) for more information.

Peck then e-mailed the following to both the County's attorney and the

AAG:

> I'm not sure I've encountered this particular situation before viz
> attorney-client privilege. . . . I would like to get greater clarity on the
> question of whether, when advising or discussing with the county in
> matters bearing on legal issues[,] there exists *any* privilege. *This*

---

[3] Although by statute, Ecology must provide "assistance and coordination" to counties in managing moderate-risk waste, Ecology is indisputably a separate agency from the County. RCW 70.105.005(10). Ecology is therefore a third party for purposes of evaluating implicit waiver by voluntary disclosure, and it is also a public agency subject to the PRA.

9

> *discernment will likely impact content in some communications, as*
> *some may bear on legal strategies.*

*Id.* at 776 (emphasis added). The AAG responded to both Peck and the County's

attorney in relevant part as follows:

> In general terms, I do not think the county would be viewed as part of
> the state in this instance, particularly because the [Attorney General's
> Office] is specifically identified as providing legal services to state
> officials and state agencies, and we do not provide legal assistance to
> counties. The exception to this is in the criminal context when our
> office does on occasion take on a criminal matter. *Thus, I think the*
> *starting assumption should be that if an Ecology staff person shares*
> *privileged information with the county sharing that information would*
> *likely result in a waiver of any associated privilege.*
>
> That is not to say that there are no options here for keeping
> information privileged. If there is a particular matter that Ecology and
> county are working on together and there is likely to be enforcement,
> there may be an ability for the two entities to enter a joint prosecution
> agreement — our office has assisted in such agreements in other
> matters. I don't know enough about the current situation to know
> whether it might work here.

*Id.* at 775 (emphasis added). Peck thanked the AAG for her advice.

From this exchange, we know that both Ecology and the County expected to

share information regarding mental impressions and legal strategies in the

underlying litigation and that Ecology, at least, was interested in keeping some of

that information confidential. We also know that both Ecology and the County

were aware that any materials sent via e-mail might be subject to the PRA because

the e-mail exchange specifically includes a notice that "[a]ll email sent to this

address will be received by the Kittitas County email system and may be subject to

10

public disclosure under Chapter 42.56 RCW and to archiving and review." *Id.* at 777. We further know that both Ecology and the County were specifically advised that the attorney-client privilege was, at best, a questionable basis for protecting confidentiality. And finally, we know that both Ecology and the County were told that there may be options for protecting confidentiality in the context of a specific case.

However, there is no indication that either Ecology or the County actually made any further efforts to determine whether or how to protect confidentiality in this specific case. In fact, the record shows precisely the opposite. If the County and Ecology truly had a mutual understanding at the time of disclosure that each would take reasonable steps to maintain the confidentiality of the other's work product, then there would have been no reason for Ecology to ask whether the unrelated attorney-client privilege would also provide confidentiality. And even if Ecology's nonattorney employee was uncertain, surely the attorney for the County would have at least *mentioned* the work product or common interest doctrines when responding to his question (unless, of course, the County did not formulate that basis for resisting production until *after* the disclosures were made). And finally, as noted above, Ecology was prepared to produce the disputed e-mails in response to Allphin's PRA request and was prevented from doing so only because the County filed this declaratory judgment action.

Ecology thus clearly did *not* have a mutual understanding with the County that both agencies would maintain the confidentiality of the disputed e-mails. Without such an understanding, the County evinced "[i]ndifference to" the substantial likelihood that an adversary could obtain the materials, which "indicates that protection of the immunity was not important to the person claiming the protection" at the time of the disclosure. RESTATEMENT § 91 cmt. b. Therefore, I would hold that the common interest doctrine does not apply.

## CONCLUSION

I would hold that the protections of the work product doctrine were waived in this case, that the common interest doctrine does not provide an exception to waiver based on the record presented here, and that the disputed e-mails are subject to compelled production pursuant to the PRA. I therefore respectfully dissent.

12

_____
Fairhurst CJ.

González, J.

*Kittitas County v. Sky Allphin, et al.*

No. 93562-9

MADSEN, J. (concurring in dissent)—I agree with the dissent's conclusion that work product protection was waived in this case. I write separately, however, because, in my view, government parties should be treated the same as private parties, as neither the Public Records Act (PRA), chapter 42.56 RCW, nor the Civil Rules distinguish work product protection based on who the parties are. I would hold that the work product protection is waived *anytime* a party voluntarily discloses its work product without a mutual understanding that the parties will maintain confidentiality, regardless of whether the parties are public agencies subject to the PRA or private individuals.

Accordingly, I concur in the dissent.

No. 93562-9
Madsen, J., concurring in dissent

_____Madsen, J._____

2